# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RYAN HIGHHOUSE,<br><br>    Plaintiff,<br><br>v.<br><br>WAYNE HIGHLANDS SCHOOL DISTRICT, et al.,<br><br>    Defendants. | CIVIL ACTION NO. 3:16-cv-00078<br><br>(SAPORITO, M.J.) |

## MEMORANDUM

This civil rights action was initiated by the filing of a complaint on January 14, 2016. (Doc. 1). Thereafter, upon the filing of a motion to dismiss for failure to state a claim (Doc. 10) the plaintiff amended his complaint on April 6, 2016. (Doc. 12). In the amended complaint, after the court granted in part and denied in part the defendants' motion to dismiss, there remains a claim for an unlawful search and seizure in violation of the Fourth and Fourteenth Amendments against defendants Gordon West and John Kretshmer; a fourteenth amendment municipal liability failure to train claim against the school district; and a punitive damages claim against defendants West and Kretshmer in their individual capacities.

The plaintiff's claims arise out of a strip search while the plaintiff, then a fifteen year old high school student, was strip searched after school district employees believed he stole $250 from another student during gym class. The school district has moved for summary judgment. (Doc. 37). For the reasons that follow, we will grant, the motion.

## I. Statement of Facts

### a. Preliminary facts and the theft of money

At the time of the alleged incident, the plaintiff, Ryan Highhouse, attended the School District's Honesdale High School and was, fifteen years old. (Doc. 38 ¶ 1; Doc. 40 ¶ 1). On February 11, 2014, the plaintiff participated with a full complement of students in gym class in the morning. Matthew Ordnung was among the participating students with the plaintiff in gym class that day. (Doc. 38 ¶ 2; Doc. 40 ¶ 2). Highhouse asked for and received approval from his gym teacher, defendant Peter West, to leave gym class early to attend an Individualized Education Program ("IEP") meeting. (Doc. 38 ¶ 3; Doc. 40 ¶ 3). When Highhouse was in the locker room changing from his gym clothes to attend the IEP meeting, Highhouse saw Ordnung's

2

wallet, picked up the wallet and then saw cash in it, and removed at least $150 from Ordnung's wallet. (Doc. 38 ¶¶ 4-5 15; Doc. 40 ¶¶ 4-5). Thereafter, Highhouse put the money that he took out of Ordnung's wallet in the back pocket of his jeans. (Doc. 38 ¶ 6; Doc. 40 ¶ 6).

### b. *The report of the theft*

After taking the money, Highhouse went to a meeting for his special education IEP meeting, which was attended by his parents and the IEP Team. (Doc. 38 ¶ 7; Doc. 40 ¶ 7). While Highhouse was attending the IEP meeting, at the end of the gym class period, Ordnung reported to West that someone had taken money from Ordnung's personal items. (Doc. 38 ¶ 8; Doc. 40 ¶ 8). Ordnung's report was made just a few minutes after the boys went into the locker room to change after gym class. (Doc. 38 ¶ 9; Doc. 40 ¶ 9). West suspected that Highhouse was the only student who had been in the locker room at the time of the theft; West suspected that Highhouse stole Ordnung's money. (Doc. 40-4, at 7; Doc. 38-4, at 8). Thereafter, West reported the theft and his suspicions regarding Highhouse to defendant John Kretschmer, Vice-Principal of Honesdale High School. (*Id.*).

After receiving the report from West, Kretschmer and West met with the plaintiff in an office which was next to the room where the IEP meeting was held. (Doc. 38 ¶ 12; Doc. 40 ¶ 12). Highhouse's mother, Harriet Highhouse, attended the IEP meeting with her son. At some point thereafter, Mrs. Highhouse was called into Kretschmer's office and he informed her that her son was searched and money was recovered from his person. (Doc. 40-2, at 17). She was not informed of the strip search. (*Id.*).

### c. *Questioning and search by school officials*

Kretschmer first questioned Highhouse about the money, and Highhouse claimed that he did not steal the money. (Doc. 38 ¶ 15; Doc. 40 ¶ 15). When Kretschmer had Highhouse turn his pockets out and lift up his pant legs, nothing was found. (Doc. 38 ¶ 16; Doc. 40 ¶ 16). After questioning, Kretschmer directed Highhouse to wait in the office reception area. (Doc. 38 ¶ 17; Doc. 40 ¶ 17). While he was sitting in the office reception area, in plain view of office staff, Highhouse took all of the money from his pants pocket and stuffed it down his underwear. (Doc. 38 ¶ 18; Doc. 40 ¶ 18). At the time, Highhouse was wearing Under Armor athletic underwear with a supporter. (Doc. 38 ¶ 19; Doc.

40 ¶ 19). The underwear had a broad band at the top with a pouch, which is where Highhouse stuffed the money. (Doc. 38-1, at 65). Kretschmer's administrative assistant, Tracy Jay, saw Highhouse shove "something" down his pants that could have been money, but she was not certain. (Doc. 38-5, at 5). Ms. Jay was seated about eight feet from where Highhouse was seated. (Doc. 40-5, at 4). She then went into Kretschmer's office and informed him of her observations. (*Id.*).

After stuffing the money into the waistband of his underwear, Highhouse went in to talk to Kretschmer, at which point Highhouse's mother was still in the next room at the IEP meeting. (Doc. 38 ¶ 23; Doc. 40 ¶ 23). Even after being confronted with Ms. Jay's observations, Highhouse continued to deny that he took the money. (Doc. 38 ¶ 23; Doc. 40 ¶ 23).

Searches of students are to be conducted by an administrator and a teacher of the same gender as the student. (Doc. 38 ¶ 26; Doc. 40 ¶ 26; Doc. 40-3, at 39). Kretschmer took Highhouse to West's office. (Doc. 38 ¶ 27; Doc. 40 ¶ 27). Prior to Highhouse's arrival at West's office, West checked Highhouse's locker to get Highhouse's gym clothes for him to change into while his clothes were searched for the money;

however, Highhouse's gym clothes were not in his locker. (Doc. 38 ¶ 28; Doc. 40 ¶ 28). Highhouse did not have any kind of a bag, backpack, or jacket with him when Kretschmer took him to West's office. (Doc. 38 ¶ 29; Doc. 40 ¶ 29). West and Kretschmer told Highhouse to empty his pockets. (Doc. 38 ¶ 30; Doc. 40 ¶ 30). West gave Highhouse a pair of sweatpants to wear during the search of his outer clothes. (Doc. 38 ¶ 30; Doc. 40 ¶ 30). Highhouse did not put on the sweatpants because he was directed to take off his pants. (Doc. 40-1, at 44). He was not directed to remove his underwear. (*Id.*). According to West, as Highhouse was changing into either the shorts or sweatpants, he and Kretschmer observed the wad of cash through his undergarment. (Doc. 404, at 8). Kretschmer saw the "green wad of money" in Highhouse's Under Armor undergarment, and directed him to pull the band out, to look for the money, and grab it. (*Id.*; Doc. 40-3, at 12). Highhouse did as instructed, and pulled the money from his undergarment and handed it to them. (*Id.* at 44-45). West and Kretschmer did not touch Highhouse either during or after the search. (Doc. 38 ¶ 34; Doc. 40 ¶ 34; Doc. 40-3, at 45, 54, 66). After he handed them the money, Highhouse was directed to put his pants back on and he complied. (*Id.*). No one else was

6

present during the search. (*Id.*). Thereafter, Highhouse was returned to the office where a ten-day suspension was imposed. (*Id.* at 46).[1]

*School district policy*

At the time that Highhouse was searched, the School District had in place Policy 226 which states as follows: "The scope and extent of searches must be reasonable in relation to the nature of the suspected evidence, contraband, or dangerous material and to the grounds for suspecting that it may be found in the place or the thing searched." (Doc. 38 ¶ 38; Doc. 40 ¶ 38). As to searches involving the removal of clothing or examination beneath clothing, School District Policy states that such searches are only permitted where there are reasons for believing that contraband is concealed inside the undergarments or the nature of the item sought presents a higher level of danger than other kinds of contraband. (Doc. 38 ¶ 39; Doc. 40 ¶ 39; Doc. 40-3, at 39). The policy further states: "that the reasons for believing that the items

---

[1] In his brief in opposition to the motion, Highhouse contends that Kretschmer and West looked at his genitals when he pulled out the elastic band of his underwear. (Doc. 41, at 10). He further argues that his genitals were exposed. (*Id.*) Highhouse's deposition transcript is devoid of any testimony that Kretschmer or West looked at Highhouse's genitalia or that they were exposed. (Doc. 40-1).

7

being searched for are concealed specifically inside undergarments are stronger reasons than grounds that would support only a more general reasonable suspicion that the student is in possession of the items or has them somewhere on the student's person. . ." (Doc. 38 ¶ 40; Doc. 40 ¶ 40; Doc. 40-3, at 39).

### *d. Post search facts*

After West and Kretschmer discovered that Highhouse stole money, they contacted the police, who came to the school and interviewed Highhouse. (Doc. 38 ¶ 43; Doc. 40 ¶ 43). On May 1, 2014, while represented by counsel, Highhouse completed a Juvenile Admission form, where he admitted that he "took money from school locker room that didn't belong to me." (Doc. 38 ¶ 44; Doc. 40 ¶ 44). A Juvenile Petition was filed, resulting in Highhouse serving six months of probation and repaying Ordnung $100. (Doc. 38 ¶ 45; Doc. 40 ¶ 45). As a consequence for theft, Highhouse was suspended from school for ten days. (Doc. 38 ¶ 46; Doc. 40 ¶ 46). After about twenty days following his return from suspension, Highhouse voluntarily left school in his junior year when other students called him a "dirty thief" and felt guilty for stealing the money. (Doc. 38 ¶ 47; Doc. 40 ¶ 47). After

Highhouse left school, he was offered the opportunity to register and return to school as long as he was living within the School District's attendance area until he reached the age of twenty-one. (Doc. 38 ¶ 48; Doc. 40 ¶ 48).

## II.     *Legal Standards*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial

responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

## III. *Discussion*

Highhouse has brought this federal civil rights action under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, the plaintiff must establish that the defendants, acting under

color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). In order to establish a § 1983 claim, two criteria must be met. First, the conduct complained of must have been committed by a person under color of state law. *Sameric Corp. of Del., Inc. v. City of Phila.*, 142 F.3d 582, 590 (3d Cir. 1998). Second, the conduct must deprive the plaintiff of rights secured under the Constitution or federal law. *Id.* Our focus here is whether the defendants deprived Highhouse of his constitutional rights. It is undisputed that Kretschmer and West were state actors. (Doc. 39).

Here, Highhouse advances an unreasonable search claim under the Fourth and Fourteenth Amendments[2]. The Fourth Amendment guarantees the "right of the people to be secure in their persons . . .

---

[2] The Fourth Amendment right to be free from unreasonable searches and seizures, originally effective only against the federal government, was incorporated and made effective against the states and state officials by the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). To the extent the plaintiff intended by his complaint to assert a free-standing due process claim under the Fourteenth Amendment (*See* Doc. 17, at 10), he has apparently abandoned any such claim by failing to address it in his brief in opposition to summary judgment. *See Carroll v. Lancaster Cty.*, 301 F. Supp. 3d 486, 499 (E.D. Pa. 2018); *Carroll v. Borough of State College*, 854 F. Supp. 1184, 1199 (M.D. Pa. 1994).

against unreasonable searches and seizures." U.S. Const. amend. IV. It generally requires a law enforcement officer to have probable cause to conduct a search. In the context of school searches, the Supreme Court has held that a school search stops short of probable cause and rather a standard of reasonable suspicion is used to determine the legality of a school administrator's search of a student. *New Jersey v. T.L.O.*, 469 U.S. 325, 341-42 (1985). In addition, the Court established a two-step inquiry to determine the reasonableness of a school official's decision to search a student. First, the search must be "justified at its inception" by the existence of "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 342. Second, the search must "be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

*In Safford Unified School District #1 v. Redding,* 557 U.S. 364, 370 (2009), the Supreme Court reaffirmed the general rule of applying "a standard of reasonable suspicion to determine the legality of a school

administrator's search of a student." The plaintiff argues that *Safford* instructs that the school "official conducting the search must have *both* reasonable suspicion that the contraband being searched for was dangerous *and* that the contraband would be secreted specifically in the student's undergarments." (Doc. 41, at 11) (emphasis in original). *Safford* states the rule differently and also created a new rule pertaining to strip searches.

> We do mean, though, to make it clear that the *T.L.O.* concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger *or of resort to underwear for hiding evidence of wrongdoing* before a search can reasonably make the quantum leap from outer clothes to backpacks to exposure of intimate parts. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.

*Id.* 557 U.S. at 377. (emphasis added). Here, West and Kretschmer were aware that Highhouse was in the locker room dressing for his IEP meeting while his classmates remained with West in gym class. Further, when Ordnung returned to the locker room with his classmates, he discovered that his money was missing. Ordnung told West that his money was missing and West immediately contacted

13

Kretschmer. At this point, it is evident that West and Kretschmer had "reasonable suspicion" to search Highhouse. Before conducting what the plaintiff refers to as a strip search[3], additional facts surfaced which justified extending the search from Highhouse's outer clothes to removing them leaving on only his Under Armor undergarment.

Before requesting that Highhouse remove his shirt and pants, Highhouse was seated outside of Kretschmer's office and in the presence of Tracy Jay, Kretschmer's administrative assistant. He was seated about eight feet from where Ms. Jay was seated. When he entered the office, he sat down. While Highhouse was seated, Ms. Jay saw "something" in his right hand which could have been the money, but she was not certain, and saw him put it down his pants. At this point, Ms. Jay went into Kretschmer's office and informed him of her observations and returned to her desk. At the time Highhouse entered Ms. Jay's office, she was aware of an investigation over missing money,

---

[3] The defendants contend that the search was not a strip search because the plaintiff was given substitute clothing to wear while West and Kretschmer intended to look through the removed clothing. They argue that it was only during the removal of Highhouse's pants that they saw the wad of money through Highhouse's Under Armor. Nevertheless, as we are required, we shall construe all inferences in the light most favorable to the non-moving party and we shall consider the motion as if the defendants conducted a strip search.

but she was not aware that Highhouse was a subject of the investigation. Despite his contention to the contrary in his brief, Highhouse admitted during his deposition that when he was sitting in the reception area outside Kretschmer's office, he removed the money from his pocket and stuffed it down the front of his underwear. (Doc. 40-1, at 41). Incredulously, in the face of this admission, Highhouse maintains that the defendants' contention and Ms. Jay's testimony that Highhouse secreted the money while seated in the reception area "was manufactured by Defendants after they learned that Plaintiff intended to sue them, . . . ." (Doc. 41, at 13).

The Court, in *Safford,* held that a search of a 13 year old female middle school student suspected of distributing contraband drugs did not justify a strip search where nothing suggested that the student was hiding common painkillers in her underwear. 557 U.S. at 376. Also, the search there yielded nothing. Here, however, reasonable suspicion initially justified the search of Highhouse's outer clothing. The additional fact of Ms. Jay's observation of Highhouse shoving something down his pants is justification, standing alone, that supported the removal of the outer clothing. Moreover, unlike *Safford*, the search

15

here yielded positive results.

In addition, when Highhouse removed his pants, Kretschmer and West observed a green wad of money through Highhouse's Under Armor undergarment. They instructed Highhouse to remove the money. Initially, Highhouse protested, but within a minute, he complied. Neither Kretschmer nor West touched the waist band, nor did they touch Highhouse in any way. After Highhouse removed the money from his undergarment, he gave it to Kretschmer and immediately put on his pants.

Next, the defendants maintain that Highhouse has not presented sufficient evidence to support his municipal liability claim under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). For a municipality to be liable under § 1983, a plaintiff must establish: (1) a deprivation of a constitutionally protected right; (2) resulting from a policy, procedure, or custom of the municipality. *Id.* at 691-94. Thus, "for there to be municipal liability, there . . . must be a violation of the plaintiff's constitutional rights." *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.,* 318 F.3d 473, 482 (3d Cir. 2003). Because we find no violation of the plaintiff's by defendants West and

Kretschmer, the plaintiff simply cannot, as a matter of law, establish a *Monell* municipal liability claim against the municipal defendant, Wayne Highlands School District. *See id.; Startzell v. City of Philadelphia, Pa.*, 533 F.3d 183, 204 (3d Cir. 2008).

Under the circumstances, there is no need for us to discuss the defendants' contention that the punitive damages claim should be dismissed, as we will grant the motion for summary judgment.

Accordingly, a separate order follows.

<u>**s/Joseph F. Saporito, Jr.**</u>
**JOSEPH F. SAPORITO, JR.**
**U.S. Magistrate Judge**

**Dated: September 24, 2018**